# NELLIE M. MULLER

## *vs.*

## CHARLES W. MULLER.

*Divorce : separation and abandonment.*

Separation and intention to abandon must concur, in order to constitute cause for divorce on the ground of abandonment; but they need not be identical as to the time of their commencement. p. 76

Desertion, to constitute a ground for divorce, requires a simultaneous separation and intent to desert; although both elements must concur, they need not begin at the same time; but the desertion begins when to one element the other is added. p. 76

When a man ended all relations with his wife and left her, contributing nothing to her support, and announced to others that he had gone to another city to join a woman, who he said was the "dearest thing on earth to him," and whom he hoped to marry, and where it does not appear that the wife concurred in the desertion, the facts of the case are such as to entitle the wife to a divorce *a mensa.* p. 77

*Decided January 14th, 1915.*

An appeal from the Circuit Court of Baltimore City. (DAWKINS, J.)

The facts are stated in the opinion of the Court.

The cause was argued before Boyd, C. J., Briscoe, Burke, Thomas, Pattison, Urner, Stockbridge and Constable, JJ.

*Clifton S. Brown,* for the appellant.

*George A. Solter* (with whom was *Wm. S. Bansemer*), for the appellee.

Burke, J., delivered the opinion of the Court.

The appellant filed a bill of complaint in the Circuit Court of Baltimore City against her husband, Charles W. Muller, asking for a divorce *a mensa* and for alimony and counsel fees. The parties were married in October, 1901, and it is alleged that the defendant abandoned the appellant on or about December 26, 1912. The abandonment relied upon took place in Baltimore City where the parties were then living. The appellee went to New York about December 26, 1912, leaving his wife in Baltimore. He has never returned and has never informed her of his intention to return. He has never requested her to join him in New York, and has never informed her where his place of residence is in that city, nor has she ever known.

The husband answered the bill, and denied that he had abandoned his wife and averred "that his residence in New York has been temporary only and for the purpose of obtaining employment." The appellant took testimony to support the allegations of the bill; but the defendant did not testify or offer any evidence. The case was set for hearing, and the lower Court, after argument by counsel for the parties, passed a decree dismissing the bill, and from this decree the wife has appealed.

The testimony in the record does not present the husband to the favorable consideration of the Court. He appears to have been a person of a sullen and disagreeable disposition, and that he frequently used abusive language towards his wife, and his conduct towards her was characterized by the

utmost coldness and indifference. The evidence shows that when he left his wife he had lost all affection for her, and for a long time prior to his going away he had shown her no consideration or attention whatever. For about five years before leaving he had declined to pay any of his wife's bills, and gave her only about fifty dollars a year for her clothing and other necessaries. For three or four years prior to his leaving, he and his wife had lived with Mr. and Mrs. A. Warfield Monroe,—his wife's parents,—who appear to be people of very moderate circumstances. During all that time he contributed nothing to his own or his wife's support, although he well knew that it was a great burden upon his wife's parents to support himself and wife. They had appealed to him to assist in defraying the household expenses, which he had failed to do, assigning as a reason that he had no money, although it had been his practice to go to New York during Christmas time to enjoy the festivities there. In November before he left, he received in cash about four thousand dollars from some real estate which he sold. He packed his trunk and took practically all his clothing of any value, and left without saying good-bye to his wife, or telling any one when he would return.

Mrs. Monroe in giving an account of the circumstances under which he left home, said, that he "had on all new clothes from his hat to his shoes, and a new overcoat, and he had his grip and a suit case and his umbrella and cane that had been fixed up for him and he had sent his trunk away. Now I do not know what was in that trunk. He packed it himself that time; before that he always had me to pack it. but this time he packed it himself, and I do not know what was in it. When he left he came out and said good-bye to Mr. Monroe and he kissed me and said good-bye, and I said. 'Charles, I hope you have a pleasant trip,' and he looked at me and walked out and did not say a word to Mrs. Muller —Nellie, his wife, who stood right there in the hall. I saw that. Q. Did he see his wife? A. Yes. He was sitting

there talking with his friend and the gentleman—the one that was there, he said 'Come and help me to the cars,' and he went off and helped him on the car; that was the last. Q. Did he say when he was coming back? A. No." In her cross-examination Mrs. Munroe said, that "his actions showed that he did not intend to come back," and that her daughter's situation had become embarrassing. There is other evidence of the same import and effect.

John T. Elliott testified that the defendant had a conversation with him just prior to leaving for New York, in which he read a portion of a letter from a woman whom the witness named. In this letter she upbraided him "for being so dilatory about getting a divorce from his wife and instances were cited—one instance was cited by her where a party under similar conditions got a divorce without any trouble, and that he was simply dilatory and was not serious, and was not doing what he said he would do." That in a subsequent conversation with defendant he referred to other communications he had received from the same woman, and he said, "I must produce the papers"—meaning the divorce papers. The witness further testified that the defendant expressed a desire to be divorced from his wife, but that he wished the initiative to be taken by her, and that he intended to leave and stay away in order that she might take the initiative, as he did not propose to contribute towards the support of two establishments—meaning one establishment for Mrs. Muller and the other an establishment for the woman named whom he intended to marry, and whom he characterized as "the dearest thing in this world to him." The witness saw the defendant in New York in January, 1913, on three occasions in company with the woman mentioned, and took meals with them at hotels or cafes; that he asked defendant whether he was coming back to Baltimore, and he said that he did not know whether he would be back or not. After leaving Baltimore he sent the plaintiff a check for a sum not exceeding fifty dollars, and also sent some

cotton or linen dress goods to Mrs. Monroe.   He also sent
advertisements and programs of musical productions, on
most of which Mrs. Monroe was obliged to pay the postage.
He told his wife to address him at a hotel in New York
where he did not live.   Since July or August, 1913, he has
never communicated with her.

It is provided by Article 16, section 38 of the Code, that
a divorce *a mensa et thoro* may be granted for "abandonment
and desertion."   The ground upon which the divorce is asked
being declared by the statute, it was necessary for the com-
plainant to allege and prove statutory cause.   Abandonment
is the deliberate act of the party complained of, done with
the intent that the marriage relation should no longer exist.
*Lynch* v. *Lynch,* 33 Md. 328; *Gill* v. *Gill,* 93 Md. 652;
*Twigg* v. *Twigg,* 107 Md. 676; *Matthews* v. *Matthews,* 112
Md. 582.   "Desertion as a matrimonial offense is the volun-
tary separation of one of the married parties from the other
or the voluntary refusal to renew the suspended cohabitation,
without justification, either in the consent, or the wrongful
conduct of the other.   Its inherent affirmative elements are
two—cohabitation ended, and the offending parties' intention
to desert."   *Bishop on Marriage and Divorce,* Vol. 1, sections
662-63.   In all cases there must be an intention to abandon.

"Separation and intention to abandon must concur in
order to constitute cause of divorce on ground of abandon-
ment; *but they need not be identical in their commencement.*
*Pinkaid* v. *Pinkaid,* 14 Tex. R. 357.

"Although to constitute desertion, there must be a simul-
taneous separation and intent to desert, and desertion does
not exist without the presence of both, the two need not begin
together, but the desertion begins whenever to either one the
other is added."   *Bishop on Marriage and Divorce,* Vol. 1,
sec. 1696; *Taylor* v. *Taylor,* 112 Md. 666.

Now, the question to be decided is: Do the facts contained
in the record show that the appellee abandoned the appellant
within the meaning of the statute as defined by the authori-

ties referred to? If he did· she is entitled to the divorce prayed for. That the appellee separated from his wife in December, 1912, is proved and is not denied. The cohabitation was ended then, and has never been resumed. No explanation or excuse has been offered for his continued absence or failure to support and protect his wife. The intention to abandon must be deduced by the Court from the facts and circumstances of the case.

The conduct and declarations of the appellee, established by the uncontradicted evidence to which we have alluded, are irreconcilable with an intention to return and discharge his marital obligations. It furnishes a reason for his remaining in New York, viz: to enjoy the companionship of her, whom he said "was the dearest thing on earth to him," and whom he hoped to marry.

In our opinion, the evidence fully meets the requirements of the statute. There is no evidence to support the contention that the appellant knew that her husband left her with the intent to abandon her, or that she concurred in the desertion. The decree must, therefore, be reversed, and the cause remanded, the appellee to pay the costs.

> *Decree reversed and cause remanded,*
> *appellee to pay costs.*